625 A.2d 1085
STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
TYRONE M. BRUNSON, DEFENDANT–APPELLANT.

Argued January 5, 1993—Decided June 15, 1993.

*Steven M. Gilson,* Designated Counsel, argued the cause for appellant (*Zulima V. Farber,* Public Defender, attorney).

*Michael J. Williams,* Deputy Attorney General, argued the cause for respondent (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney).

The judgment of the Court was announced by

STEIN, J.

*N.J.S.A.* 2A:81–12 permits the introduction into evidence of a witness's prior convictions for the purpose of affecting the credibility of that witness. We interpreted that statute in *State v. Sands,* 76 *N.J.* 127, 386 *A.*2d 378 (1978), and concluded that whether a prior conviction may be admitted to impeach a testifying criminal defendant is a decision that rests within the sound discretion of the trial court. In *Sands,* we set forth broad guidelines for trial courts to follow in deciding whether the probative value of a prior conviction with respect to credibility outweighs the likelihood that its admission will create undue prejudice. *Id.* at 147, 386 *A.*2d 378.

In this case we consider whether admission into evidence of defendant's prior convictions for offenses similar to the charged offenses unfairly prejudiced defendant. We also consider whether evidence of prior convictions similar to charged offenses generally should be "sanitized" by limiting the evidence of prior similar-crime convictions so that the jury is not informed of the substantial similarity of the prior crime to the charged crime. Finally, we address defendant's claim that the State failed to establish an uninterrupted chain of custody sufficient to permit the introduction into evidence of cocaine found at the crime scene.

I

In October 1988, while investigating reports of narcotics activity, Elizabeth Police Department plainclothes detectives Koczur, Shields, and Owsiany observed defendant and an unidentified man in front of a telephone booth. According to Detective Koczur's testimony, defendant gave the other man a small item in exchange for an amount of money. Detective Shields stopped his unmarked police vehicle, and as Detective Koczur alighted from the vehicle, the unidentified man fled. He was not apprehended.

Detective Koczur approached defendant in what Koczur described as a "casual manner." Defendant reached into his right pants pocket, turned towards the telephone and, without depositing any money, began dialing. Detective Koczur testified that as he had approached defendant, he had observed that the telephone receiver was "on the hook." As Koczur continued to approach him, defendant reached into his waistband and removed several glass vials containing a white powdery substance. He dropped the vials to the ground. Detective Koczur immediately informed defendant that he was under arrest. According to Koczur's testimony, defendant attempted to break away from the detective, and as the two struggled, defendant stepped on the vials, "crushing them and kicking them in all

directions." Detectives Shields and Owsiany intervened, and defendant was eventually handcuffed.

Detective Koczur put defendant in the police car while Detectives Shields and Owsiany attempted to scrape off the ground the white powdery substance they believed to be cocaine. The powder was mixed with crushed glass and colored plastic caps. Detective Shields testified that he had used a cigarette box and cellophane tape to collect the remnants of the powder. At police headquarters Detective Koczur completed a property slip for the cigarette box and put his name, the case number, and his initials on the property bag before sealing it. The bag was then placed in the police department safe. Detective Koczur also searched defendant and found in his jacket pocket $160 in twenty-dollar denominations; in his front right pants pocket, a crushed twenty-dollar bill; and in his front left pants pocket another six dollars. Detective Koczur did not find any evidence of narcotics on defendant's person.

Defendant was indicted for third-degree possession of a controlled dangerous substance, cocaine; third-degree possession of a controlled dangerous substance, cocaine, with intent to distribute; fourth-degree resisting arrest; and fourth-degree hindering apprehension or prosecution.

At a pre-trial hearing, the State indicated that if defendant were to testify, it would offer defendant's prior convictions to impeach his credibility. In 1987, defendant had pleaded guilty to possession of a controlled dangerous substance, possession of a controlled dangerous substance with intent to distribute, and theft. The trial court, in accordance with our decision in *Sands*, considered the remoteness and seriousness of the prior convictions. Noting that the predominant criterion of *Sands* is remoteness, the court stated:

> In this particular matter I find that when we look at the main criteria of remoteness, we are talking about a very short period of time. * * *
>
> These particular crimes that the defendant pleaded guilty to involve possession of a controlled dangerous substance as well as a theft charge and they

certainly, in my opinion are the types of evidence matters that could very well affect credibility * * *.

Over defendant's objection, the trial court ruled that defendant's prior convictions would be admissible to impeach defendant's credibility if he were to testify.

At trial, Detective Koczur testified to the alleged drug transaction and defendant's subsequent struggle with the detectives. Investigator Jose Martinez of the Union County Narcotics Strike Force, qualified as an expert in drug distribution, testified that the plastic caps retrieved from the sidewalk fit into glass vials that, when filled with cocaine, would sell for twenty dollars. Martinez testified that in his opinion defendant had possessed cocaine with the intent to distribute.

Defendant did not testify at trial. He was advised by counsel that he had a right to testify and that the State could introduce his prior convictions to affect his credibility. He was also informed that he was entitled to have the jury instructed that it could not draw any adverse inference from his silence. Defendant declined such a charge. The sole witness for the defense was defendant's former girlfriend, Robin Johnson. Ms. Johnson testified that at the time of the alleged transaction, defendant had called her from a pay telephone to discuss their plans to go to the movies that evening. She testified that they had been on the telephone for approximately twenty minutes and that their conversation had ended when the phone had disconnected because defendant was not there to deposit more money.

The jury returned a "guilty" verdict on all counts. For sentencing purposes, the trial court merged the possession and possession-with-intent-to-distribute counts. Pursuant to the State's motion, the court sentenced defendant to an extended term of six-years imprisonment with a mandatory minimum of three years. *N.J.S.A.* 2C:43–6f. The court also imposed fines and penalties totaling $1,300.

Defendant appealed, arguing that the trial court should have sanitized the evidence of his prior controlled-dangerous-sub-

stance convictions or, in the alternative, should have excluded them because they were not a reflection of defendant's lack of veracity. Defendant also contended that if the Appellate Division were to reject those two alternatives, it should conclude that the trial court had abused its discretion by failing to distinguish the prior convictions in respect of their relevance to credibility, observing that the theft conviction alone would have impeached his credibility sufficiently. Defendant also alleged error in the trial court's admission into evidence of the cocaine that had been scraped from the sidewalk, contending that the State had failed to establish an uninterrupted chain of custody.

In an unpublished opinion, the Appellate Division rejected defendant's contentions and affirmed the convictions. We granted defendant's petition for certification raising substantially the same arguments, 130 *N.J.* 13, 611 *A.*2d 652 (1992).

## II

*N.J.S.A.* 2A:81–12 states:

For the purpose of affecting the credibility of any witness, his interest in the result of the action, proceeding or matter or his conviction of any crime may be shown by examination or otherwise, and his answers may be contradicted by other evidence. Conviction of crime may be proved by the production of the record thereof, but no conviction of an offender shall be received in evidence against him in a civil action to prove the truth of the facts upon which the conviction was based.

In *Sands, supra,* 76 *N.J.* 127, 386 *A.*2d 378, we reviewed the history of the statute and determined that *N.J.S.A.* 2A:81–12 does not mandate the admission of every prior conviction of a testifying defendant. *Id.* at 147, 386 *A.*2d 378. We recognized that *Evidence Rule* 4 embodies a reservoir of judicial discretion. That Rule provides:

The judge may in his discretion exclude evidence if he finds that its probative value is substantially outweighed by the risk that its admission will * * * (b) create substantial danger of undue prejudice or of confusing the issues or of misleading the jury.

Recognizing the competing values underlying *N.J.S.A.* 2A:81–12 and *Rule* 4, we held in *Sands* that

[t]he trial judge shall admit evidence of criminal convictions to affect credibility of a criminal defendant unless in his discretion he finds that its probative force because of its remoteness, giving due consideration to relevant circumstances such as the nature of the crime, and intervening incarcerations and convictions, is substantially outweighed so that its admission will create undue prejudice. By recognizing this discretionary power in the trial judges, we shall have removed an obstacle "in their conscientious efforts to insure fair trial and do justice."

[76 *N.J.* at 147, 386 *A.*2d 378 (quoting *State v. Hawthorne,* 49 *N.J.* 130, 149, 228 *A.*2d 682 (1967) (Jacobs, J. concurring)).]

*N.J.S.A.* 2A:81–12 is based on the widespread belief that a criminal conviction is probative of a witness's credibility. *Hawthorne, supra,* 49 *N.J.* at 145, 228 *A.*2d 682:

"[T]here is a basis in reason and experience why one may place more credence in the testimony of one who has lived within the rules of society and the discipline of the law than in that of one who has so demonstrated antisocial tendency as to be involved in and convicted of serious crime."

[*Sands, supra,* 76 *N.J.* at 143, 386 *A.*2d 378 (quoting *State v. Harless,* 23 *Utah* 2d 128, 459 *P.*2d 210, 211 (1969)).]

The *Sands* holding also is predicated on the assumption that one who previously has been convicted of a crime may evade the truth to avoid a subsequent conviction.

Nevertheless, we have recognized in the context of *Evidence Rule* 55 that other-crimes evidence may be simultaneously probative and prejudicial. *State v. Stevens,* 115 *N.J.* 289, 300, 558 *A.*2d 833 (1989). *Evidence Rule* 55 bars the introduction into evidence of other crimes to prove a defendant's criminal nature but permits introduction of other-crimes evidence to prove a fact in issue at trial. In *Stevens, supra,* we noted the tendency of other-crimes evidence to turn a jury against a defendant. *Id.* at 302–03, 558 *A.*2d 833. The prejudice inherent in other-crimes evidence, even when it is probative of a fact in issue, is that a jury, on hearing that evidence, may be influenced to return a guilty verdict because it considers the defendant to be a criminal. *See State v. Cofield,* 127 *N.J.* 328, 336, 605 *A.*2d 230 (1992). The inflammatory nature of other-crimes evidence also may influence juries unduly when that evidence is admitted for impeachment purposes under *N.J.S.A.* 2A:81–12.

In an effort to mitigate the prejudice of a prior conviction introduced to impeach the credibility of a testifying defendant, we have held that the trial court must explain carefully to the jury the limited purpose of prior-conviction evidence. *Sands, supra,* 76 *N.J.* at 142 n. 3, 386 *A.*2d 378 (citing *State v. Sinclair,* 57 *N.J.* 56, 63, 269 *A.*2d 161 (1970)). Despite a trial court's efforts to limit the prejudicial impact of prior convictions, criminal defendants often choose not to testify in order to keep the prior-conviction evidence from the jury. *See* Harry Kalven, Jr. & Hans Zeisel, *The American Jury* 146 (1966) (reporting that 74% of defendants with a criminal record testified as compared to 91% of those defendants without a record). A defendant who fails to testify, however, also withholds his or her version of the facts from the jury. In addition, silence may suggest to the jury that the defendant has something to hide, a concern that may be tempered by the trial court's instruction to the jury that it should not draw an adverse inference from a defendant's silence. *Carter v. Kentucky,* 450 *U.S.* 288, 302, 101 *S.Ct.* 1112, 1120, 67 *L.Ed.*2d 241, 252 (1981); *State v. Bogus,* 223 *N.J.Super.* 409, 422, 538 *A.*2d 1278 (App.Div.), *certif. denied,* 111 *N.J.* 567, 546 *A.*2d 497 (1988).

Although prior-conviction evidence is effective in impeaching a defendant's credibility, concern frequently is raised about the extent to which juries consider that evidence as proof of guilt. Commentators generally agree that the use of prior-conviction evidence is fraught with a high risk of prejudice, and they express skepticism about the effectiveness of an instruction to the jury to limit its use of the evidence to an assessment of defendant's credibility. *See* James E. Beaver & Steven L. Marques, *A Proposal to Modify the Rule on Criminal Conviction Impeachment,* 58 *Temp.L.Q.* 585 (1985); James H. Gold, *Sanitizing Prior Conviction Impeachment Evidence to Reduce Its Prejudicial Effects,* 27 *Ariz.L.Rev.* 691 (1985); Robert G. Spector, *Impeaching the Defendant by his Prior Convictions and the Proposed Federal Rules of Evidence: A Half Step Forward and Three Steps Backward,* 1 *Loy.U.Chi.L.J.*

247 (1970); Ed Gainor, Note, *Character Evidence by Any Other Name * * *: A Proposal to Limit Impeachment by Prior Conviction Under Rule 609*, 58 *Geo.Wash.L.Rev.* 762 (1990); Note, *To Take the Stand or Not to Take the Stand: The Dilemma of the Defendant with a Criminal Record*, 4 *Colum.J.L. & Soc.Probs.* 215 (1968). Critics of prior-conviction impeachment evidence are concerned with a jury's tendency to convict a defendant if it knows the defendant previously has committed a crime. As one commentator explains, "The theory of 'limited use' under which such explosive evidence is put before the jury fails to correspond to the actual effect of the evidence even in the minds of the most sober and conscientious jurors." H. Richard Uviller, *Evidence of Character to Prove Conduct: Illusion, Illogic, and Injustice in the Courtroom*, 130 *U.Pa.L.Rev.*, 845, 882 (1982). The risk that juries will use such evidence for an impermissible purpose is particularly high if the prior conviction is for a similar crime. Gold, *supra*, 27 *Ariz.L.Rev.* at 692. Nevertheless, the rationale for admitting prior-conviction evidence is that a jury is able to follow a trial court's limiting instruction and consider evidence of a prior conviction only to assess a defendant's credibility and not consider such evidence in assessing the likelihood of his or her guilt.

Professors Wissler and Saks conducted a study of jurors' use of prior-conviction evidence, predicting that "[i]f the law's rationale is correct, more convictions would result when the prior conviction is for perjury; but if jurors are misusing the information, more convictions would result from a prior conviction for the same crime * * *." Roselle L. Wissler & Michael J. Saks, *On the Inefficacy of Limiting Instructions*, 9 *J.L. & Hum.Behav.* 37, 39 (1985). They concluded that prior-conviction evidence did not affect significantly the predisposition of jurors to doubt the credibility of criminal defendants. However, their study determined that the rate of conviction varied depending on the type of crime previously committed, the highest conviction rate resulting when the prior crime was the

same as the charged offense. *Id.* at 43. Those results corroborated the findings of several earlier studies. See Anthony N. Doob & H.M. Kirshenbaum, *Some Empirical Evidence on the Effect of s. 12 of the Canada Evidence Act Upon the Accused,* 15 *Crim.L.Q.* 88 (1972); Valerie P. Hans & Anthony N. Doob, *Section 12 of the Canada Evidence Act and the Deliberations of Simulated Juries,* 18 *Crim.L.Q.* 235 (1975).

Other jurisdictions have acknowledged and attempted to address the problem presented when a defendant previously has been convicted of a similar offense. One approach has been to exclude evidence of a prior conviction if it is similar to the offense charged and other convictions are available to impeach a defendant. *United States v. Bagley,* 772 *F.*2d 482 (9th Cir.1985) (considering similarity of prior conviction and availability of other dissimilar prior convictions, court concluded that admission of prior conviction for robbery to impeach defendant on trial for robbery was error), *cert. denied,* 475 *U.S.* 1023, 106 *S.Ct.* 1215, 89 *L.Ed.*2d 326 (1986); *Gordon v. United States,* 383 *F.*2d 936, 940 (D.C.Cir.1967) ("[W]here multiple convictions of various kinds can be shown, strong reasons arise for excluding those which are for the same crime because of the inevitable pressure on lay jurors to believe that 'if he did it before he probably did so this time.' "), *cert. denied,* 390 *U.S.* 1029, 88 *S.Ct.* 1421, 20 *L.Ed.*2d 287 (1968). In other states, evidence of prior convictions is inadmissible to impeach the credibility of a testifying defendant. *Ga.Code Ann.* § 24–9–20 (1992); *Kan. Stat.Ann.* § 60–421 (1983); *Mont.R.Evid. 609; State v. Santiago,* 53 *Haw.* 254, 492 *P.*2d 657, 661 (1971) (convicting "a criminal defendant where prior crimes have been introduced to impeach his credibility as a witness violates the accused's constitutional right to testify in his own defense").

Several courts have allowed the prosecution to introduce evidence of a criminal defendant's prior conviction of a crime similar to the charged offense without permitting evidence of the specific crime, a procedure often referred to as "sanitization." *See State v. Geyer,* 194 *Conn.* 1, 480 *A.*2d 489 (1984)

(recommending sanitization of prior convictions not directly reflecting on credibility); *Waller v. State*, 395 *A*.2d 365 (Del. 1978) (sanitizing all prior convictions); *Commonwealth v. Richardson*, 674 *S.W.*2d 515 (Ky.1984) (same); *State v. Pitts*, 212 *Neb.* 295, 322 *N.W.*2d 443 (1982) (same); *State v. McClure*, 298 *Or.* 336, 692 *P.*2d 579 (1984) (sanitizing similar prior convictions); *State v. Rutchik*, 116 *Wis.*2d 61, 341 *N.W.*2d 639 (1984) (sanitizing all prior convictions). Sanitization of a defendant's prior convictions allows the jury to use evidence of such convictions to assess credibility; however, exclusion of any evidence describing the specific offense reduces the risk of impermissible use by the jury.

The rule in this state for admission of prior convictions to affect credibility does not distinguish between crimes that involve dishonesty and those that do not. The analogous federal rule and several similar state formulations mandate the admission of evidence of crimes involving dishonesty and false statements and permit the introduction of other felony convictions if the probative value outweighs the prejudicial effect. *See, e.g., Fed.R.Evid.* 609(a); *Fla.Stat.Ann.* § 90.610(1) (1992); *Ark.R.Evid.* 609(a); *Tenn.R.Evid.* 609(a); *Wash.R.Evid.* 609(a). The New Jersey Legislature rejected *Uniform Rules of Evidence R. 21* proposed by a Supreme Court Committee on Evidence, which would have limited the admission of prior-conviction evidence to those convictions involving dishonesty or false statement. *1963 Report of Supreme Court Committee on Evidence, Rule 21* at 65–66. The Legislature thus expressed its view that any prior conviction has probative value with respect to a criminal defendant's credibility.

In *State v. Pennington*, 119 *N.J.* 547, 575 *A.*2d 816 (1990), we declined the defendant's invitation to adopt the "Connecticut rule" and require that a prior murder conviction be sanitized before admission into evidence to impeach a testifying defendant at his capital-murder trial. *Id.* at 585–87, 575 *A.*2d 816. During a robbery of a family-run neighborhood tavern, Frank Pennington shot and killed Arlene Connors. In a sworn state-

ment to the police, Pennington admitted to the robbery and the shooting, acknowledging that after the other customers had left, he drew a gun, with three safeties, and demanded the money in the cash register. Although admitting that he had removed the safeties, Pennington claimed that he had not intended to hurt anyone and had shot the victim after she had thrown a glass of beer at him. Pennington also told the police that he did not "feel like [he] really meant to shoot her, [he] just pointed the gun and it went off." *Id.* at 558, 575 *A.*2d 816. The State disputed the defendant's version of the shooting. The trial court held a pre-trial hearing and ruled admissible for impeachment purposes two burglary convictions, an armed-robbery conviction, and a murder conviction. The defendant did not take the stand in his own defense.

The critical issue at trial was Pennington's mental state. The substance of his sworn statement was introduced through the testimony of a police officer. *Ibid.* Thus, the jury heard Pennington's admission of the shooting. He was ultimately convicted of felony murder and knowing or purposeful murder. At the penalty phase, the prosecution introduced evidence of Pennington's prior murder conviction. *Id.* at 585, 575 *A.*2d 816.

Because Pennington had admitted the robbery and the shooting of the victim in the course of the robbery, Pennington's responsibility for the victim's death was not disputed. The issue that the jury was to resolve was the specific form of homicide that Pennington had committed, which depended largely on the jury's conclusions about his state of mind. "On the evidence, it was virtually a foregone conclusion that [Pennington] would be convicted of some kind of homicide. Defendant did not dispute that he shot the victim * * *." *Id.* at 570, 575 *A.*2d 816.

Nevertheless, on direct appeal, after reversing the defendant's capital conviction and death sentence based on *State v. Gerald,* 113 *N.J.* 40, 549 *A.*2d 792 (1988), we considered the defendant's contention that the trial court had erred in not

ruling that his prior murder conviction should have been sanitized before admission into evidence to impeach Pennington if he were to testify at trial. 119 *N.J.* at 585–87, 575 *A.*2d 816. We recognized the potential prejudicial effect on a capital defendant of the admission of a prior murder conviction but were not persuaded to depart from the rule of *Sands*. *Id.* at 586, 575 *A.*2d 816. We noted that the potential prejudice must be weighed against the countervailing consideration that serious crimes should be given weighty effect, and expressed concern that prejudice might ensue from jury speculation about the nature of the crime if that information were not revealed. *Ibid.* We observed that admission of evidence of the defendant's prior murder conviction during the penalty phase of Pennington's trial diminished the persuasive force of the argument that sanitization would prevent the jury from hearing that he had previously been convicted of murder. *Id.* at 587, 575 *A.*2d 816. In retrospect, our focus on the admissibility of Pennington's prior murder conviction undoubtedly was affected by our recognition that the prior conviction could be relevant only to Pennington's credibility on the question of his state of mind at the time of the homicide, but would not have been influential on the question of Pennington's responsibility for the victim's death, that issue having been conceded by Pennington's statement to the police.

## III

In *Sands, supra,* we held that trial courts should admit evidence of a prior criminal conviction unless, because of its remoteness, its probative force on the issue of the defendant's credibility is substantially outweighed by the prejudicial effect of its admission. 76 *N.J.* at 147, 386 *A.*2d 378. Recognizing that a jury might use a prior conviction as evidence of a defendant's criminal disposition and not as evidence probative of a defendant's credibility, we noted that trial courts must explain carefully to juries the limited purpose for which the prior-conviction evidence may be used. *Id.* at 142 n. 3, 386 *A.*2d

378 (citing *Sinclair, supra,* 57 *N.J.* at 63, 269 *A.*2d 161). In *Stevens, supra,* we expressed our concern that a limiting instruction may not cure the prejudice inherent in other-crimes evidence admitted under *Rule* 55. 115 *N.J.* at 309, 558 *A.*2d 833. On occasion, we have found a trial court's limiting instruction insufficient to combat the prejudicial impact of *Rule* 55 evidence. *See Cofield, supra,* 127 *N.J.* at 341–42, 605 *A.*2d 230 ("The trial court's failure to focus the jury's attention on the limited purpose for which the evidence was admissible allowed the jury such free rein that it was clearly capable of confusing propensity with [the charged offense].").

The introduction into evidence of a similar prior conviction to impeach a testifying defendant is doubtless highly prejudicial, and that prejudice is unlikely to be cured by a limiting instruction. A limiting instruction imposes on a juror the difficult burden of distinguishing the subtle difference between the impermissible use of prior-conviction evidence to assess the likelihood of a defendant's guilt, and the permitted use of the same evidence to assess that defendant's credibility. Nevertheless, just as the State may impeach the credibility of a defendant who has been convicted of a dissimilar crime, the State is entitled to impeach the credibility of a criminal defendant who previously has been convicted of a similar crime.

To accommodate those competing principles, we modify our ruling in *Sands* and hold that in those cases in which a testifying defendant previously has been convicted of a crime that is the same or similar to the offense charged, the State may introduce evidence of the defendant's prior conviction limited to the degree of the crime and the date of the offense but excluding any evidence of the specific crime of which defendant was convicted. That method of impeachment will insure that a prior offender does not appear to the jury as a citizen of unassailable veracity and simultaneously will protect a defendant against the risk of impermissible use by the jury of prior-conviction evidence. The balance struck adequately vindicates the State's interest in using the prior conviction to cast

doubt on the defendant's credibility without subjecting defendant "to the extraordinary prejudice that follows if the prior crime was specifically named or described." *Pennington, supra,* 119 *N.J.* at 607, 575 *A.*2d 816 (Handler, J., concurring in part, dissenting in part). "The difference between lack of credibility as a repetitive felon and lack of credibility as a repetitive car thief was negligible to the prosecution, catastrophic to the accused." *Bendelow v. United States,* 418 *F.*2d 42, 53 (5th Cir.1969) (Godbold, J., concurring in part, dissenting in part), *cert. denied,* 400 *U.S.* 967, 91 *S.Ct.* 379, 27 *L.Ed.*2d 387 (1970).

A defendant wary of jury speculation about the unspecified offense may introduce evidence of the nature of the prior conviction. Sanitization of prior-conviction evidence of similar crimes merely limits the scope of the prosecution's cross-examination of a defendant to the date, degree, and number of similar prior convictions. A defendant may choose to waive the protection afforded by that limitation.

We no longer adhere to our holding in *Pennington* to the extent that it is inconsistent with the foregoing conclusion. We note that the prior-conviction issue in that case was presented as plain error and arose in the context of a capital trial in which the defendant had admitted his responsibility for the victim's death, but contested whether he possessed the requisite state of mind to support a conviction for murder. Thus, our refusal to reverse the trial court's admission of evidence of Pennington's prior murder conviction reflected the practical recognition that in the context of the cumulative weight of Pennington's inculpatory statements, admission of that evidence would not have affected the jury's determination concerning Pennington's responsibility for the victim's death, and might have had only a marginal impact on the jury's assessment of Pennington's credibility with respect to his state of mind.

Prior to defendant's trial in the instant case, the court ruled admissible for impeachment purposes defendant's prior convic-

tions for possession of a controlled dangerous substance, possession of a controlled dangerous substance with intent to distribute, and theft. Defendant contends that to avoid the prejudicial effect of the introduction into evidence of the two similar prior convictions, he did not testify at trial. He concedes the admissibility of his theft conviction.

Because that pre-trial ruling is in conflict with the rule we now adopt for admission of evidence of prior similar convictions, we reverse defendant's conviction and remand for a new trial. We note that only two of defendant's three prior convictions are similar to the offenses presently charged. If on retrial the State should choose to introduce all three prior convictions for impeachment purposes, the trial court should sanitize all three convictions to avoid the speculation that inevitably would occur if evidence were introduced to prove the theft conviction and the convictions of the unidentified crimes. Alternatively, the State may prefer to introduce only the theft conviction, in which case evidence of the nature of that offense may be admitted.

## IV

Defendant also contends that the State failed to establish an uninterrupted chain of custody of the cocaine seized at the crime scene and admitted into evidence. Because we reverse defendant's conviction on other grounds, we need not address that contention in detail.

A party introducing tangible evidence has the burden of laying a proper foundation for its admission. That foundation should include a showing of an uninterrupted chain of possession. *State v. Brown*, 99 *N.J.Super.* 22, 27, 238 *A.*2d 482 (App.Div.), *certif. denied*, 51 *N.J.* 468, 242 *A.*2d 16 (1968). When the custodian is a State agency, the State is not obligated to negate every possibility of substitution or change in condition of the evidence. *Ibid.* Such evidence generally should be admitted if the trial court "finds in reasonable probability that

the evidence has not been changed in important respects or is in substantially the same condition as when the crime was committed." *Id.* at 28, 238 *A*.2d 482 (citations omitted).

At trial, Detective Koczur testified to the usual police procedure for identifying, safeguarding, and processing narcotics seized in the course of an arrest. He then identified the cigarette box containing crushed glass and white powder that he had secured at the time of defendant's arrest. He further testified that with the exception of the addition of the Union County Prosecutor's laboratory identification numbers, the evidence was in the same condition as when he had confiscated it. The cigarette box was then, without objection, admitted into evidence.

Defendant did not object to the admission of the evidence at trial. Neither does he offer any proof of substitution or tampering. The trial court properly admitted the cigarette box containing crushed glass and cocaine and properly denied defendant's motion for acquittal on the chain-of-custody basis.

## V

To impeach the credibility of a testifying defendant, the State may introduce into evidence only the number, degree, and date of the defendant's prior similar convictions. When a defendant has multiple prior convictions, some of which are similar to the charged offense and some of which are dissimilar, the State may introduce evidence only of the date and degree of crime of all of the defendant's prior convictions, but cannot specify the nature of the offenses. Alternatively, the State may introduce without limitation evidence of only the dissimilar convictions. That modification of the manner in which the State may impeach the credibility of a testifying defendant will apply only prospectively, affording defendant in this case the benefit of our decision. See *State v. Burstein,* 85 *N.J.* 394, 403, 427 *A*.2d 525 (1981).

The judgment of the Appellate Division is reversed, and the case is remanded to the Law Division for retrial.

HANDLER, Justice, concurring in part and dissenting in part.

Defendant was convicted of third-degree possession of cocaine, third-degree possession of cocaine with intent to distribute, and fourth-degree hindering apprehension or prosecution, as well as a disorderly persons offense. In 1987, a year prior to the events that gave rise to the instant charges against him, defendant had pled guilty to possession of cocaine, possession of cocaine with intent to distribute, and theft. *Ante* at 381, 625 *A.*2d at 1087.

The trial court, relying on *State v. Sands,* 76 *N.J.* 127, 386 *A.*2d 378 (1978), ruled that the prosecution would be allowed to use defendant's prior convictions to impeach defendant on cross-examination. Faced with the likelihood that if he exercised his right to testify on his own behalf the jury would hear evidence that he had committed identical crimes just one year earlier, defendant declined to testify.

Today, the Court reverses defendant's convictions, finding that the trial court erred in agreeing to admit unsanitized evidence of defendant's prior convictions for crimes similar to those for which defendant was being tried. *Ante* at 392–393, 625 *A.*2d at 1092–1093. The Court establishes a limited sanitization rule applicable to prior convictions that are similar to the crime for which defendant is being tried, which will specify only the "date, degree, and number of [a defendant's] prior similar convictions." *Ante* at 392, 625 *A.*2d at 1093.

I write separately to express my view of the standards for sanitization, which differ somewhat from the rule announced by the Court. In so doing, I reiterate the analysis I proposed in *State v. Pennington,* 119 *N.J.* 547, 604–09, 575 *A.*2d 816 (1990) (Handler, J., concurring in part and dissenting in part), in support of the "Connecticut Rule," in which all prior crimes, not

directly reflecting on credibility, are sanitized before admission into evidence for the purpose of impeachment.

I

The relevance of prior crimes to the credibility and competence of witnesses has developed in New Jersey law for almost two centuries. *Sands, supra,* 76 *N.J.* 127, 386 *A.*2d 378. Under the common law, criminal defendants were not competent to testify on their own behalf. *Id.* at 139, 386 *A.*2d 378. Under a statute enacted by the Legislature in 1799, and in effect until 1871, no person convicted of any one of a number of specified crimes could testify as a witness "unless he or she be first pardoned * * *." *State v. Hawthorne,* 49 *N.J.* 130, 133, 228 *A.*2d 682 (1967) (overruled by *Sands, supra,* 76 *N.J.* at 127, 386 *A.*2d 378). The list of crimes provided in the 1799 statute, however, did not include many crimes of "great turpitude," some of which had direct bearing on the veracity of a witness, including counterfeiting, bribery, and extortion by judges. *Sands, supra,* 76 *N.J.* at 134, 386 *A.*2d 378 (citing *State v. Henson,* 66 *N.J.L.* 601, 605–06, 50 *A.* 468 (E. & A.1901)).

The Legislature, in 1871, modified the that rule to allow previously-convicted defendants to testify on their own behalf. *Ibid.* Three years later, in 1874, previously convicted persons were allowed to testify on another's behalf, provided that the opposing party could, for the purpose of impeachment, introduce evidence of the witness' prior convictions. *Id.,* 76 *N.J.* at 135, 386 *A.*2d 378. As the Court noted in *Sands,* however, the 1874 act—although limiting the disability to testify imposed on people with previous convictions—also vested "a general power in the prosecutor to use any prior conviction to impeach a witness." *Ibid.* (citing *Hawthorne, supra,* 49 *N.J.* at 133–35, 228 *A.*2d 682).

That rule is currently codified at *N.J.S.A.* 2A:81–12. The rule, however, is phrased permissively, i.e., prior convictions "*may* be shown * * *." (emphasis added). Accordingly, con-

troversy arose over whether trial courts possessed the discretion to prevent admission of prior-convictions evidence on the basis of undue prejudice to the defendant. This Court, in 1967, addressed that issue in *Hawthorne, supra,* 49 *N.J.* at 130, 228 *A.*2d 682. There, the Court found that trial courts did not possess the "discretion to admit or exclude evidence of a defendant's previous convictions of a crime." *Id.* at 134–35, 228 *A.*2d 682.

Eleven years later, the effect of the rule was ameliorated when the Court overturned *Hawthorne* in *Sands, supra,* 76 *N.J.* at 127, 386 *A.*2d 378. The Court held, in *Sands,* that trial courts were empowered to decide whether evidence of prior convictions would be admitted for the purpose of impeachment. *Id.,* 76 *N.J.* at 144, 386 *A.*2d 378. The general standard governing the determination of admissibility was the "remoteness" of the prior convictions to the crime charged. Although "[o]rdinarily evidence of prior convictions should be admitted," *ibid.,* trial courts were obliged to "balance the lapse of time and the nature of the crime to determine whether the relevance with respect to credibility outweighs the prejudicial effect to the defendant." *Id.* at 144–45, 386 *A.*2d 378. Accordingly, *Sands* may be seen as bringing *Hawthorne's* sweeping and unconditional interpretation of the language of *N.J.S.A.* 2A:81–12 under the restraining influence of *Evidence Rule* 4. *Accord State v. Whitehead,* 104 *N.J.* 353, 358, 517 *A.*2d 373 (1986) (holding "[i]n New Jersey, the admissibility of prior convictions for impeachment purposes is governed by the interplay between *N.J.S.A.* 2A:81–12 and Evidence Rule 4"). That rule provides, *inter alia,* that where the probative value of evidence "is substantially outweighed by the risk that its admission will * * * create substantial danger of undue prejudice," the trial court may, in its discretion, exclude the evidence. *Evid.R.* 4. See *Sands, supra,* 76 *N.J.* at 144, 386 *A.*2d 378.

The Court, in its decision today, recognizes that the rule authorizing impeachment based on prior convictions implicates virtually the same concerns that arise from the rules governing

-the use of other-crimes evidence. Drawing on its prior analysis of *Evidence Rule* 55, the Court notes that "other crimes evidence may be simultaneously probative and prejudicial," *ante* at 384, 625 *A*.2d at 1089, and that other-crimes evidence has a unique tendency to turn a jury against the defendant. *State v. Stevens*, 115 *N.J.* 289, 302, 558 *A*.2d 833 (1989); *ante* at 384, 625 *A*.2d at 1089. As the Court stated in *Stevens:*

> It is this inflammatory characteristic of other-crime evidence that mandates a careful and pragmatic evaluation by trial courts, based on the specific context in which the evidence is offered, to determine whether the probative worth of the evidence outweighs its potential for undue prejudice.
>
> [115 *N.J.* at 303, 558 *A*.2d 833.]

The uniquely prejudicial nature of other-crimes evidence, the Court observes, may also manifest itself when such evidence, in the form of prior convictions, is introduced for the purpose of impeachment. *Ante* at 384, 625 *A*.2d at 1089. A concern over balancing the probative worth of prior-crimes evidence against its prejudicial effect was clearly involved in the impeachment rule formulated by the Court in *Sands*. Nevertheless, that rule did not provide an effective mechanism for achieving the "careful and pragmatic" evaluation of evidence of prior crimes by trial courts. The exclusive reliance of the *Sands* rule on a "remoteness" standard failed to foreclose the admission of prior-crimes' evidence that generated undue prejudice to defendants. Today the Court confronts the highly prejudicial effect of prior-crimes evidence and attempts to rectify the patent shortcomings of the existing rule and practices. *Ante* at 391, 625 *A*.2d at 1092.

## II

Faced with the competing goals of protecting criminal defendants from undue prejudice and respecting the State's legitimate interest in "impeach[ing] the credibility of a criminal defendant who previously has been convicted of a similar crime," *ante* at 391, 625 *A*.2d at 1092, the Court acknowledges that the *Sands* approach is inadequate and that only the saniti-

zation of similar prior offenses can be effective. I fully concur in the reasons that bring the Court to that conclusion. Three years ago in *Pennington,* I expressed the view that sanitization would provide a means by which "a defendant could be impeached without being subjected to the extraordinary prejudice that follows if the prior crime was specifically named or described." 119 *N.J.* at 607, 575 *A.*2d 816 (Handler, J., dissenting).

The dissenting opinion argues that sanitization is inconsistent with *Sands* and the statute, *N.J.S.A.* 2A:81–12, as well as the proposed *Evidence Rule* 609. *Post* at 409, 625 *A.*2d at 1101. I would maintain that that criticism is unfounded and that, in recognizing the need for imposing some form of sanitization of prior convictions for impeachment purposes, the Court has effectively answered the criticism of the dissenting opinion. Moreover, I would argue that the criticism of the dissenting opinion begs completely the central question before the Court: does assuring a fair trial for criminal defendants *require* the revision of the rule of *Sands,* the limitation of *N.J.S.A.* 2A:81–12 by the imperative of *Evidence Rule* 4, and the prospective modification of proposed *Evidence Rule* 609, which "follows the existing rule admitting *any* prior conviction"? *Post* at 409, 625 *A.*2d at 1101 (emphasis added).

Interestingly, while admitting that courts, in the admission of prior-crimes evidence, should be cognizant of the "danger of undue prejudice," *post* at 409, 625 *A.*2d at 1101, the dissent ignores entirely the ever-growing body of empirical evidence and scholarly consensus that juries use prior-crimes evidence not to assess credibility but to infer guilt based on bad character. See *ante* at 385–387, 625 *A.*2d at 1089–1090. Because the dissent offers no argument or evidence to refute the Court's contention that unsanitized prior crimes—particularly when those crimes are similar to the offense for which the defendant is being tried—have an unduly prejudicial effect on juries, I take it that the dissent accepts that contention. Consequently, the insistence of the dissent on uncritical adherence to the rule

of *Sands*, which provides minimal constraints on the sweeping language of *N.J.S.A.* 2A:81–12, is all the more perplexing.

Although the Legislature may, where a rational basis exists, establish a statutory presumption of the probative worth of certain types of evidence, *State v. Sinclair*, 57 *N.J.* 56, 64, 269 *A.*2d 161 (1970), it may not relieve trial courts of their duty to exclude evidence the prejudicial effect of which seriously compromises a defendant's right to a fair trial. Accordingly, I disagree with the dissent and concur in the Court's decision to overrule its contrary holdings in *Sands* and *Pennington*.

### III

The Court establishes a limited-sanitization rule. It would require sanitization of only those prior convictions that are similar to the offense for which the defendant is being tried. *Ante* at 391, 625 *A.*2d at 1092. Dissimilar prior convictions could still be admitted unsanitized. For cases in which multiple prior convictions existed—some similar, some dissimilar—the State would have the option of admitting all the prior convictions in a sanitized form, or excluding the similar prior convictions while admitting the *dissimilar* prior convictions in an unsanitized form. *Ibid.*

The Court's rule, in my opinion, is much too limited and will not, I submit, overcome the almost ineradicable undue prejudice that inheres in unsanitized prior-crimes evidence. My differences with the Court's decision are reflected to some degree in my disagreement with its interpretation of the *Pennington* case. My understanding of *Pennington* and my reading of the studies cited by the Court on behalf of the rule it enunciates today lead me to take issue with the mechanism of sanitization that the Court has established, *ante* at 391, 393, 625 *A.*2d at 1092, 1093.

In *Pennington*, the trial court permitted the admission of evidence of the defendant's *non vult* plea to a first degree murder charge. 119 *N.J.* at 604, 575 *A.*2d 816. The defendant

had received second-degree sentences for that offense. *Ibid.* The defendant invited this Court to adopt the "Connecticut Rule," which provided for the sanitization of all prior convictions that do not bear directly on veracity. The Court declined that invitation, because it "would mark a pronounced departure from the *Sands* rule, which has served well for twelve years." *Id.* at 586, 575 *A.*2d 816.

I dissented from that part of the Court's holding in *Pennington* because I believed that, particularly in the context of a capital-murder prosecution, the effect on the jury of admitting evidence of a prior murder conviction would be so inflammatory as to deny the defendant a fair trial. *Id.* at 606, 575 *A.*2d 816 (Handler, J., dissenting). At that time I believed that limiting instructions simply would not avail to undo the extreme prejudice caused by admission of a prior murder conviction. *Ibid.* Additionally, I was convinced that the refusal of the trial court to sanitize the defendant's prior murder conviction deprived the defendant of due process of law by unduly burdening the defendant's right to testify on his own behalf. *Id.* at 608–09, 575 *A.*2d 816.

Intent on minimizing the inconsistency between its decision today and its determination of *Pennington, ante* at 388–390, 625 *A.*2d at 1091–1092, the Court eschews a broader form of sanitization. The Court does so apparently because it believes that the introduction of Pennington's prior murder conviction "would not have been influential on the question of Pennington's responsibility for the victim's death." *Ante* at 390, 625 *A.*2d at 1092.

In its description of the *Pennington* case, the Court states that "[b]ecause Pennington admitted the robbery and the shooting of the victim in the course of the robbery, Pennington's responsibility for the victim's death was not disputed." *Ante* at 389, 625 *A.*2d at 1091. By that statement, the Court apparently means that no real question existed about the fact that Pennington had *caused* the victim's death. That says nothing,

however, about the impact of the prior murder conviction on the critical issue in contention at Pennington's trial, namely, his state of mind.

The Court itself acknowledges that "the issue to be resolved by the jury was the specific form of homicide that Pennington had committed, which depended largely on the jury's conclusions about his state-of-mind." That acknowledgment cannot be reconciled with the Court's subsequent assertion that the introduction of Pennington's prior murder conviction "might have had only a marginal impact on the jury's assessment of Pennington's credibility with respect to his state-of-mind." *Ante* at 392, 625 *A*.2d at 1093. In *Pennington*, to paraphrase a statement quoted by the Court, the difference between lack of credibility as a repetitive felon and lack of credibility as one who had murdered before, " 'was negligible to the prosecution, catastrophic to the accused.' " *Ante* at 392, 625 *A*.2d at 1092 (quoting *Bendelow v. United States*, 418 *F*.2d 42, 53 (5th Cir.1969) (Godbold, J., concurring in part, dissenting in part), *cert. denied*, 400 *U.S.* 967, 91 *S.Ct.* 379, 27 *L.Ed.*2d 387 (1970)).

The defendant in *Pennington* was charged with capital murder, which then required that the State prove the defendant "purposely or knowingly" had caused the death of his victim. *State v. Gerald*, 113 *N.J.* 40, 49, 549 *A*.2d 792 (1988). The defendant, although granting that he had shot the victim, disputed that he had *intended* to cause the victim's death. As the Court acknowledges, and correctly observes, "The critical issue at trial was Pennington's mental state." *Ante* at 389, 625 *A*.2d at 1091.

The central task of the jury in *Pennington* was to determine whether the defendant had intentionally committed murder. The inference is compelling that the defendant, in choosing not to testify on his own behalf during the guilt phase of the trial, believed that the admission of evidence of his prior murder conviction would so inflame the jury that a conviction for *intentional* murder was virtually assured. That conclusion

seems inescapable and is in fact well supported by the studies that the Court marshals for its holding today. *Ante* at 386–387, 625 *A*.2d at 1090–1091.

The prejudicial impact of a prior conviction for murder introduced only for impeachment is distinctive and can be devastating. In that regard, I would observe that although prior convictions for similar crimes have the strongest prejudicial effect on jurors, the prejudicial impact of prior convictions for murder is only slightly less. The Court cites the Wissler and Saks study for the proposition that "the highest conviction rate result[ed] when the prior crime was the same as the charged offense," *ante* at 386–387, 625 *A*.2d at 1090. The study demonstrates that when compared to a prosecution in which no prior-crimes evidence was introduced, in cases in which the jury heard impeachment evidence of prior convictions for the same crime, the conviction rate rose dramatically by an average of 75%. Roselle L. Wissler & Michael J. Saks, *On the Inefficacy of Limiting Instructions*, 9 *J.L. Hum. Behavior* 37, 43 (1985) (See Table 2 "Per cent of Juries Voting to Convict"). When the prior crime was different from that charged, the increase in conviction rate was lower. Nevertheless, when murder was introduced as the dissimilar prior crime, the conviction rate increased to 70%. *Ibid.*

The defendant in *Pennington* was faced, then, with the worst of all possible worlds: a prior conviction that was both similar to the crime for which he was being tried and was also for murder. I am still convinced of what I wrote in dissent in *Pennington:* "It is naive to believe that a jury struggling to decide whether [the] defendant intentionally committed murder would not be influenced by the knowledge that [the] defendant had killed before, or realistically would consider the prior murder as indicative only of defendant's lack of truthfulness." 119 *N.J.* at 606, 575 *A*.2d 816.

The Court, in its reading of *Pennington, ante* at 392, 625 *A*.2d at 1093, seems to be making two assertions: (1) because

the fact that Pennington was the causal agent of the victim's death was virtually undisputed, the evidence of his prior murder conviction could not have had a measurable impact on the jury's determination that Pennington had caused (*i.e.*, "was responsible for") the victim's death; and (2) in the light of that evidence, the introduction of Pennington's prior murder had no significant impact on the jury's determination of Pennington's state of mind.

Two comments must be made about the second assertion: it does not follow from the first assertion and it is contradicted by the studies the majority cites in support of its holding today. The point at issue in *Pennington* was not the defendant's responsibility as the cause of the victim's death. The point at issue was the defendant's state of mind when he took the actions that caused that death. The Court's assertion, that evidence of Pennington's prior murder conviction "might have had only a marginal impact on the jury's assessment" of his credibility on his state-of-mind at the time he shot his victim, is wrong. *Ante* at 392, 625 *A.*2d at 1093. Even more troublesome and less defensible is the apodictic certitude of the Court's belief that the admission of Pennington's prior murder did not justify the reversal of his capital murder conviction.

Finally, the premise on which the majority's treatment of *Pennington* rests—that the prior conviction did not have a determinative impact on the jury's resolution of the state-of-mind question—is contrary to common sense, scholarly consensus, empirical evidence, and the rationale of the Court's own holding.

It seems clear to me that the Court can find no refuge in *Pennington*. Its ineluctable lesson is that defendants confronted with prior convictions for identical crimes are most at peril from the misuse of that evidence. Defendants placed in the same position as Pennington are prejudiced, and that "prejudice is self-evident, inescapable, and destructive." *Ibid. Pennington* also illustrates the obvious point that when prior

crimes involve egregious charges or circumstances, their prejudicial potential and capacity for misuse become extreme. That analysis and understanding of *Pennington* demonstrate, I believe, the need for a broad and effective sanitization rule in dealing with prior-crimes convictions as a basis for impeaching a criminal defendant.

## IV

I am not convinced that the Court's mechanism is adequate for ameliorating the undue prejudice to defendants that accrues from the admission of prior convictions. As earlier noted, certain crimes, like murder, have an undue prejudicial effect nearly equal to that of similar prior convictions. *Supra* at 385, 625 *A*.2d at 1089. As one of the authors cited by the Court has observed, "The risk of prejudice is acute when the impeaching conviction is for a particularly reprehensible offense, such as murder or sexual assault." James H. Gold, *Sanitizing Prior Conviction Impeachment Evidence to Reduce Its Prejudicial Effects*, 27 *Ariz.L.Rev.* 691, 697 (1985) (cited *ante* at 385, 625 *A*.2d at 1089). The author ultimately concludes:

There is also no sound reason for employing sanitization only when the impeaching crime is similar to the charged offense. * * * Although the need for sanitization may be greatest in this situation, sanitization also alleviates the risk of prejudice which results when the defendant is impeached with a dissimilar, but serious prior offense.

[*Id.* at 703.]

Accordingly, I would argue for the rule I proposed in *Pennington:* sanitization of all prior crimes not directly reflecting on credibility. 119 *N.J.* at 607, 575 *A*.2d 816.

This Court, in the context of *Evidence Rule* 55, offered the guidance that "[i]n weighing the probative worth of other-crime evidence, a court should consider not only its relevance but whether its proffered use in the case can adequately be served by other evidence." *Stevens, supra,* 115 *N.J.* at 303, 558 *A*.2d 833. In the case of prior convictions for impeachment purposes, I would contend that "[t]he introduction of a sanitized prior conviction carries enough of a negative connotation to

effectively impeach a defendant, and this effectiveness is unaffected by the degree of similarity between the impeaching crime and the charged offense." *Gold, supra,* 27 *Ariz.L.Rev.* at 701.

Sanitizing all prior convictions that do not reflect directly on veracity, the so-called "non-*crimen falsi*" crimes, will better protect a defendant's right to a fair trial without significantly diminishing the State's interest in impeachment by use of prior convictions.

The use of prior convictions for impeachment purposes is founded on the belief that " 'one may place more credence in the testimony of one who has lived within the rules of society and the discipline of the law than in that of one who has so demonstrated antisocial tendency as to be involved in and convicted of serious crime.' " *State v. Sinclair,* 57 *N.J.* 56, 64, 269 *A.*2d 161 (1970) (quoting *State v. Harless,* 23 *Utah* 2d 128, 130, 459 *P.*2d 210 (1969)). The intuitive appeal of that idea is difficult to deny. Perhaps that intuitive appeal comes from the fact that "[i]t is much easier to conclude that a person is bad than that he did something bad." *State v. Allen,* 429 *Mich.* 558, 420 *N.W.*2d 499, 504 (1988).

Juries in our system of criminal justice, however, are not charged with determining a defendant's guilt based on the defendant's propensity to commit crime. In fact, they are expressly prohibited from doing so. Nevertheless, the overwhelming consensus of empirical studies on the use of prior-crimes evidence for impeachment purposes confirms a point made by one of the researchers in Kalvin and Zeisel's landmark study, *The American Jury:* that juries exhibit an

"almost universal inability and/or unwillingness either to understand or follow the court's instructions on the use of defendant's prior criminal record for impeachment purposes. The jurors almost universally used defendant's record to conclude that he was a bad man and hence was more likely than not guilty of the crime for which he was then standing trial."

[*Id.* at 508 (quoting a letter from Dale W. Broeder, Associate Professor, University of Nebraska College of Law, who conducted intensive jury inter-

views for *The American Jury* study, to Yale Law Journal, dated March 14, 1960).]

Today's decision by the Court makes a significant advance toward eliminating the undue prejudice that results from the admission of prior convictions. Regrettably, I do not believe that the mechanism for remedying that prejudice, which the Court proposes today, provides sufficient protection for defendant's rights.

By way of an aside—albeit one extremely important and necessary to express—I would remark on the still more disturbing fact that the Court has come to an awareness of the devastating impact of similar prior-crimes evidence on the fairness of a criminal trial in a *non-capital* case, when it was resolutely oblivious to that awareness in a *capital* case. When read in the light of *Pennington*, the Court's decision today is further confirmation of a proposition for which I have argued before: that "[a]lthough the Court professes to grant capital-murder defendants enhanced protections under the Constitution and statute, it fails to deliver such protections." *State v. Marshall*, 123 *N.J.* 1, 256, 586 *A.2d* 85 (1991) (Handler, J., dissenting). It is as if the Court has, however indeliberately, given the phrase "death is different," *Gregg v. Georgia*, 428 *U.S.* 153, 188, 96 *S.Ct.* 2909, 2932, 49 *L.Ed.2d* 859, 883 (1976); *Furman v. Georgia*, 408 *U.S.* 238, 306, 92 *S.Ct.* 2726, 2760, 33 *L.Ed.2d* 346, 388 (1972) (Stewart, J., concurring); *State v. Ramseur*, 106 *N.J.* 123, 524 *A.2d* 188 (1987); *State v. Williams*, 93 *N.J.* 39, 459 *A.2d* 641 (1983), an inverted meaning.

Nevertheless, although I believe the decision of the Court today further exposes infirmities in the Court's capital-punishment jurisprudence, I commend the Court for its willingness to repudiate aspects of that jurisprudence in a non-capital context and to enunciate a rule that promises—even with the deficiencies I have identified—to provide greater fairness in the trial of all criminal cases.

## V

For those reasons, I concur in part and dissent in part from the judgment of the Court.

POLLOCK, Justice, dissenting.

Four years ago, a defendant subject to the death penalty asked us to reverse his conviction because the trial court had admitted evidence of his prior convictions for armed robbery, burglary, and murder. *State v. Pennington*, 119 *N.J.* 547, 585–87, 575 *A.*2d 816 (1990). On other grounds, the Court reversed the conviction and remanded the matter for retrial. In reversing, the Court declined the defendant's request to adopt a rule requiring the "sanitization" of his prior convictions, the very rule that the Court adopts today. We wrote in *Pennington:*

> The well-established rule in this jurisdiction is that admission of a prior conviction "into evidence against a criminal defendant rests within the sound discretion of the trial judge * * *. Ordinarily evidence of prior convictions should be admitted and the burden of proof to justify exclusion rests on the defendant." *State v. Sands*, 76 *N.J.* 127, 144, 386 *A.*2d 378 (1978). Further, "[t]he key to exclusion is remoteness." *Ibid.* Remoteness involves both the passage of time and the nature of the offense. *Ibid.* "The trial court must balance the lapse of time and the nature of the crime to determine whether the relevance with respect to credibility outweighs the prejudicial effect to the defendant." *Id.* at 144–45, 386 *A.*2d 378.
>
> "Sanitization" would mark a pronounced departure from the *Sands* rule, which has served well for twelve years. We are not persuaded to depart from *Sands* or to establish an exception for a prior murder conviction in a capital case. In so holding, we recognize the potential prejudicial effect in such a case of a prior murder conviction. That potential prejudice must be weighed against the countervailing consideration, however, that serious crimes should be given weighty effect. Moreover, even greater prejudice might ensue from jury speculation about the nature of a conviction for an unspecified crime.
>
> [119 *N.J.* at 586, 575 *A.*2d 816 (alterations in original).]

Both in *Sands, supra*, 76 *N.J.* at 132–33, 138, 147, 386 *A.*2d 378, and in its opinion today, *ante* at 383–384, 625 *A.*2d at 1088–1089, the Court has acknowledged that the admissibility of convictions is governed by *N.J.S.A.* 2A:81–12, which provides that "[f]or the purpose of affecting the credibility of any witness ... his conviction of any crime may be shown by examination or otherwise...." *Sands* recognized that when

applying the statute, courts should be guided by *Evidence Rule* 4 and "exclude remotely relevant evidence, the probative value of which is offset by the possible confusion of issues and danger of undue prejudice." 76 *N.J.* at 144, 386 *A.*2d 378. I believe that the "sanitization" rule adopted by the Court today is inconsistent with *N.J.S.A.* 2A:81–12 and with *Sands*'s holding on the use of prior convictions. Accordingly, I would defer to the Legislature on the adoption of any such rule. See *State v. D.R.*, 109 *N.J.* 348, 375–77, 537 *A.*2d 667 (1988).

Moreover, since our decision in *Pennington*, our Committee on the Rules of Evidence has proposed *Evidence Rule* 609, which follows *N.J.S.A.* 2A:81–12 as interpreted by *Sands*. *See* 129 *N.J.L.J.* 1, 25–27 (Supp. Oct. 10, 1991). The proposed Rule provides:

> For the purpose of affecting the credibility of any witness, the witness' conviction of a crime shall be admitted unless excluded by the judge as remote or for other causes. Such conviction may be proved by examination, production of the record thereof, or by other competent evidence.

The Rule "makes no admissibility distinction in terms of the crime of which the witness has been convicted" and "draws no distinction between crimes of dishonesty or false statement and other crimes." Comment on *Proposed Evid.R.* 609, 129 *N.J.L.J.* 26 (Supp. Oct. 10, 1991). In proposing *Rule* 609, the Committee declined to include "restrictive provisions on the use of criminal convictions to impair credibility." *Ibid.* From this, I conclude that proposed *Rule* 609, which is scheduled to take effect on July 1, 1993, favors the existing rule admitting any prior conviction for impeachment. The Committee did not suggest "sanitization" or any other changes in *N.J.S.A.* 2A:81–12.

In sum, I thought *Pennington* was correctly decided four years ago. Nothing has happened in the interim that would change my mind. I would affirm.

CLIFFORD and GARIBALDI, JJ., join in this dissent.

410

*For Affirmance*—Justices CLIFFORD, POLLOCK and GARIBALDI—3.

*For Reversal and Remandment*—Chief Justice WILENTZ and Justices HANDLER, O'HERN and STEIN—4.